IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

MOSAID TECHNOLOGIES INC.,

    Plaintiff,

v.

LSI CORPORATION and AGERE
SYSTEMS LLC,

    Defendants.

LSI CORPORATION and AGERE
SYSTEMS LLC,

    Counterclaim-Plaintiffs,

v.

MOSAID TECHNOLOGIES INC.;
LENOVO (UNITED STATES) INC.;
LENOVO GROUP LTD.; and
LENOVO (SINGAPORE) PTE. LTD.,

    Counterclaim-Defendants

Civil Action No. 10-192-RGA

<u>MEMORANDUM OPINION</u>

February __, 2014


ANDREWS, U.S. DISTRICT JUDGE:

Presently before the Court are LSI Corporation and Agere Systems LLC's Motion Pursuant to F.R.E. 702 to Exclude Certain of Plaintiff's Expert Opinions (D.I. 296) and Plaintiff MOSAID Technologies Inc.'s Motion for Reconsideration of the Court's Decision to Exclude Plaintiff's Cost of Capital (D.I. 389). The issues have been fully briefed. (D.I. 297, 310, 318, and 425). For the reasons stated below, LSI/Agere's motion is granted[1] and MOSAID's motion for reconsideration is denied.

## I. BACKGROUND

Federal Rule of Evidence 702 sets out the requirements for expert witness testimony and states:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

FED. R. EVID. 702. The Third Circuit has explained:

> Rule 702 embodies a trilogy of restrictions on expert testimony: qualification, reliability and fit. Qualification refers to the requirement that the witness possess specialized expertise. We have interpreted this requirement liberally, holding that "a broad range of knowledge, skills, and training qualify an expert." Secondly, the testimony must be reliable; it "must be based on the 'methods and procedures of science' rather than on 'subjective belief or unsupported speculation'; the expert must have 'good grounds' for his o[r] her belief. In sum, *Daubert* holds that an inquiry into the reliability of scientific evidence under Rule 702 requires a determination as to its scientific validity." Finally, Rule 702 requires that the expert testimony must fit the issues in the case. In other words, the expert's testimony must be relevant for the purposes of the case and must assist the trier of fact. The Supreme Court explained in *Daubert* that "Rule 702's 'helpfulness' standard requires a valid scientific connection to the pertinent inquiry as a precondition to admissibility."

---

[1] The Court orally granted the Defendants' motion on September 9, 2013.

*Schneider ex rel. Estate of Schneider v. Fried*, 320 F.3d 396, 404 (3d Cir. 2003) (footnote and internal citations omitted).

Applying the above framework makes it clear that the Defendants' motion must be granted and the proposed expert testimony excluded. MOSAID's expert witness, Dr. O'Brien, utilized unreliable principles and methods and his expert opinion is based on insufficient facts and data. For the same reasons, MOSAID's motion for reconsideration is denied.

## II. DISCUSSION

The dispute before the Court arose out of MOSAID's January 2007 acquisition of certain patents from Agere (which later merged with LSI) in a highly competitive bidding process. (D.I. 297 at 5). Agere assigned the acquired patents to MOSAID under the terms of the 2007 Patent Assignment Agreement ("2007 PAA"), and Section 5.1(f) of this agreement contained a "non-exhaustive" list of entities that did not have a license agreement with Agere for the patents included in the 2007 PAA. *Id.* Lenovo was listed as one of these unlicensed entities. The Court, however, has found that Lenovo was licensed at the time of the 2007 PAA, and that this misrepresentation by Agere constituted a breach of the 2007 PAA. (D.I. 255 at 10-11). Damages are the only issue remaining for determination.

### A. Dr. O'Brien's Testimony

Dr. O'Brien seeks to opine on the damages suffered by MOSAID–specifically lost profits and the expected return on its investment–as a result of LSI/Agere's breach. Dr. O'Brien states that, but-for Agere's misrepresentation to MOSAID that Lenovo was unlicensed, MOSAID would have been able to reach a license deal with Lenovo and that lost profits are appropriate to

compensate MOSAID for Lenovo's potential royalty payments to MOSAID.[2] Dr. O'Brien further explains that MOSAID used a 20% cost of capital to evaluate its investment in acquiring the patents through the 2007 PAA.[3] (D.I. 310 at 11-12).

Support for Dr. O'Brien's opinion can be found largely, if not exclusively, in a MOSAID document titled the "Final Business Case," which "is an unbiased assessment that was prepared without the contemplation of litigation and is the best evidence to determine MOSAID's state of mind and investment requirements at the time the parties entered in to the 2007 PAA."[4] (*Id.* at 12). The Final Business Case provides support for several central assumptions that form the basis for Dr. O'Brien's damages opinion. These assumptions include the fact that "20% of Lenovo's products receive their Wi-Fi capability from Atheros, an unlicensed chip supplier" and that MOSAID "would have been able to license Lenovo in the fourth quarter of 2010 without litigation." (*Id.* at 6-7). These assumptions, along with others contained in the Final Business Case, were not independently verified by Dr. O'Brien,[5] and indeed MOSAID's best argument for

---

[2] "In this 'but-for-the-breach' world–where MOSAID would have sought to license an *unlicensed* Lenovo–Dr. O'Brien properly calculated a consequential damages quantification of the lost profit royalties MOSAID would likely have received from Lenovo." (D.I. 310 at 5).

[3] In addition to the reasons set forth below, the 20% cost of capital is an improper topic for expert testimony. As the Court understands it, the cost of capital is essentially a special pre-judgment interest rate to be applied to the damages figure. That interest-based calculation is properly reserved for the Court, not for the jury. The Court acknowledges that MOSAID claims the 20% cost of capital is not a substitute for pre-judgment interest. (D.I. 389 at 6 ("In terms of what MOSAID would agree to pay in 2007 if it had known about defendants' breach, MOSAID would use its cost of capital in its Final Business Case.")). But nothing in MOSAID's briefs fits the 20% cost of capital into any damages theory that makes any sense to the Court.

[4] MOSAID's brief in opposition to the motion to exclude Dr. O'Brien's expert testimony is replete with references to the Final Business Case as support for his opinion: "Dr. O'Brien's basis is derived from . . . MOSAID's contemporaneously-prepared written Final Business Case," "Dr. O'Brien's basis is factually supported because it stems from the MOSAID Final Business Case," and "Dr. O'Brien's opinion derived from the Final Business Case." (D.I. 310 at 6-9).

[5] When asked whether he did "anything to verify the accuracy" of the assumption made in the Final Business Case that 20% of Lenovo sales contained an Atheros chip, Dr. O'Brien responded: "No. I relied upon the Final Business Case for that," and later admitted that the actual percentage "could be much lower, much higher, or even zero." (D.I. 298-5 at 32, 35-36). The same is true with regard to Dr. O'Brien's opinion on the 20% cost of capital. Dr. O'Brien admitted that he had not evaluated any of MOSAID's other investments to confirm that the 20% cost of capital was an accurate measure, or even a reasonable one, and he indicated that he had not done anything to verify the 20% figure "[o]ther than to see that's what [MOSAID] used in the Final Business Case." (*Id.* at 27).

4

their reliability seems to be that the assumptions in the Final Business Case are "the *best* evidence" of what "*would have* occurred" if a "*hypothetical* licensing negotiation"[6] took place between MOSAID and Lenovo. (*Id.* at 7 (emphasis added)). This justification falls short of the reliability standard set by Federal Rule of Evidence 702.

When faced with similar facts, the Third Circuit excluded expert testimony based on a business planning document. *See ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254, 291 (3d Cir. 2012). In *ZF Meritor*, "the core" of the expert's damages testimony was based on a strategic business plan. *Id.* The court explained that "experts often rely on business plans in forming damages estimates," but the expert's "reliance on the [business plan] in this case was improper because he did not know either the qualifications of the individuals who prepared the [business plan] estimates or the assumptions upon which the estimates were based." *Id.* The court qualified this by noting that, "In some circumstances, an expert might be able to rely on the estimates of others in constructing a hypothetical reality, but to do so, the expert must explain why he relied on such estimates and must demonstrate why he believed the estimates were reliable." *Id.* at 292.

As in *ZF Meritor*, "the core" of Dr. O'Brien's testimony on damages is based upon a business plan, namely the Final Business Case. It does not appear that Dr. O'Brien was a member of the team that developed the Final Business Case, so he has no personal knowledge of the assumptions that were made or the qualifications of those persons in charge of making the assumptions. He also has provided no support for the accuracy of the statements and figures contained in the Final Business Case or otherwise "demonstrate[d] why he believed the estimates

---

[6] Hypothetical licensing negotiations are an analytical tool that MOSAID has borrowed from patent law. In my opinion, hypothetical licensing negotiations are irrelevant to breach of contract cases generally and to this breach of contract case in particular.

5

were reliable." Therefore, the reasoning from *ZF Meritor* applies and Dr. O'Brien's expert testimony as to lost profits and the cost of capital must be excluded as unreliable under Federal Rule of Evidence 702.[7]

Even if Dr. O'Brien's lost profits theory were consistent with the *Daubert* standard, it is insufficient under New York law, which allows the recovery of lost profits only in rare situations. *See Tractebel Energy Mktg., Inc. v. AEP Power Mktg. Inc.*, 487 F.3d 89, 109 (2d Cir. 2007) (permitting recovery of lost profits as form of consequential damages under New York law only if "(1) it is demonstrated with certainty that the damages have been caused by the breach, (2) the extent of the loss is capable of proof with reasonable certainty, and (3) it is established that the damages were fairly within the contemplation of the parties"). The Second Circuit has noted that, under New York law, "where the breach involves the deprivation of an item with a determinable market value, the market value at the time of the breach is the measure of damages." *Sharma v. Skaarup Ship Mgmt. Corp.*, 916 F.2d 820, 825-26 (2d Cir. 1990) (noting that lost profits have been permitted in cases where the contract dealt with items that "did not have a market value and were not replaceable"). This method of calculating damages implicitly accounts for any future lost profits. *Id.* at 826 ("The value of assets for which there is a market is the discounted value of the stream of future income that the assets are expected to produce. This stream of income, of course, includes expected future profits and/or capital appreciation. To be sure, uncertainties about the future and lack of perfect information may cause an asset to be under- or over-valued at any particular time. At that time, however, either party has an opportunity to hedge according to his or her judgment about the future stream of income."). In

---

[7] Nothing in the parties' subsequent briefing has convinced the Court that reconsideration of this decision is warranted.

this case, the opportunity to license Lenovo does have a "determinable market value." That value is the crux of this case and the subject of voluminous pages of expert reports. By comparison, the future value of any lost profits is not capable of proof with "reasonable certainty." Arguing for lost profits as a stand-alone theory, therefore, is inappropriate in this case. *See Tractebel*, 487 F.3d at 109. The proper measure of damages is the market value of the opportunity to license Lenovo—measured at the time of the breach—which includes future lost profits. *See Sharma*, 916 F.2d at 825-26.

## III. CONCLUSION

For the reasons stated above, the Defendants' motion to exclude is granted and the Plaintiff's motion for reconsideration is denied.